IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LATANYA M. STEPHENSON        :           CIVIL ACTION
                             :
        v.                   :
                             :
CITY OF PHILADELPHIA, et al. :           NO. 05-1550


O'NEILL, J.                              June 27, 2006


<u>MEMORANDUM</u>

Plaintiff, Latanya M. Stephenson, a former Philadelphia Prison System Correctional

Officer, filed a complaint on April 5, 2005, alleging that defendants – the City of Philadelphia,

her former employer; Press Grooms, a former Philadelphia Prison System Deputy Commissioner;

David Adams, a former Philadelphia Prison System Warden; William Lawton, a former

Philadelphia Prison System Captain (now Deputy Warden); Thomas Costello, a former

Philadelphia Prison System Commissioner; and Louis Giorla, a former Philadelphia Prison

System Major (now Warden) – engaged in gender discrimination, sexual harassment, and

retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., the

Pennsylvania Human Relations Act, 43 P.S. § 955 (a) and (d), and the Philadelphia Fair Practices

ordinance, 9 Phila. Code § 1101 et seq.  Before me now is defendant's motion for summary

judgment and plaintiff's response thereto.

1

BACKGROUND

Latanya Stephenson's complaint arises out of her employment as a correctional officer with the Philadelphia Prison System from August 1991 to February 2002.  Upon completion of her training at the PPS Academy in August 1991, Stephenson worked at Holsmberg Prison for several years.  After several short-term PPS positions, Stephenson began working at Alternative and Special Detention in 1997 and received a promotion to the rank of sergeant in 1998.  In her complaint and her deposition, Stephenson has identified ten alleged incidents of discrimination, harassment, or both, that occurred during her employment at PPS.

I.  First Incident: Failure to Provide Back-up

Stephenson alleges that sometime between August and December, 1991, she became involved in an altercation with a male prisoner.  Stephenson called for assistance, but her co-workers did not arrive.  Stephenson claims that two co-workers later told her that she would receive assistance in similar situations if she "gave into certain advances."  Stephenson did not describe the effect this comment had upon her and did not mention any discussion with superior officers concerning this incident.

II.  Second Incident: Instruction to "Play Cards Right"

According to Stephenson, in 1999, her supervisors, including Captain William Lawton, began making harassing public comments to Stephenson approximately three to four times per week.  Specifically, Stephenson recalled that Lawton told Stephenson that she "could go real far in the prisons if [she] played her cards right."  Relying upon her work experience in the prison system, Stephenson interpreted this comment as suggesting that she could advance her career if

she "slept around."  Stephenson did not report this incident as required by PPS's policy on sexual harassment, even though she signed a memo acknowledging  receiving and understanding the policy.

III.  Third Incident: Abandoning her Post

Stephenson alleged that in 1999 she received a disciplinary write-up for abandoning her post.  Wanting to gain experience in incident investigation, Stephenson requested and received permission from her supervisor, Lieutenant Edmonds, to accompany another sergeant in the investigation of a prisoner injury in another area of the prison.  After Stephenson left to investigate the incident, Edmonds wrote-up Stephenson for abandoning her post.  Stephenson complained about the write-up to the ASD warden, Warden Legesse, who then discarded the write-up.  Without mentioning specific instances, Stephenson claims that other male sergeants routinely received permission to accompany one another on investigations.

IV.  Fourth Incident: Stephenson's Uniform

In 2000, Stephenson's supervisors began assigning her to work at the "600 " building, a satellite center of ASD.  Prison policy requires correctional officers to wear civilian clothes when working at the "600" building.  When an officer initially reports for duty at ASD, the officer must wear a correctional officer uniform.  If a supervisor sends the officer to work at "600," the supervisor usually permits the officer to remain in ASD uniform.  Stephenson alleges that when she received such unscheduled assignments to "600" supervisors demanded that she change out of her work uniform and into civilian dress.  In one particular instance, Stephenson's immediate supervisor, Lieutenant Patricia Howard, relayed to Stephenson specific orders from Lawton for

Stephenson to return home to change into civilian clothes and then report for duty at "600." The next day, Lawton commented to fellow supervisors, and in front of Stephenson, that "Steve [Stephenson] was looking pretty good down at 600 [yesterday]." Stephenson did not report this incident in accordance with the PPS's sexual harassment policy.

## V.  Fifth Incident: Denial of Request for Personal Leave

Stephenson claims that in 2000 her supervisors treated her requests for leave differently from requests made by male sergeants. Stephenson alleges that her supervisors publicly refused her requests for leave, whereas such denials customarily occurred in private between the employee and supervisor. Further, supervisors often required Stephenson, but not other male sergeants, to provide specific and detailed reasons for requesting leave. According to Stephenson, supervisors consistently granted male employees' leave requests on short notice, including requests made on the day of desired leave. On one particular occasion, Lawton refused to grant Stephenson leave to attend a meeting with her daughter's teacher on September 6, 2000. Stephenson attributed this refusal to the general pattern of delay and scrutiny her leave requests received even though, according to Stephenson, Lawton granted similar requests for "everyone else." Stephenson claims that she raised concerns about her alleged unfair treatment with supervisors. In one instance, another supervisor, Major Louis Giorla, refused to overturn Lawton's denial of her request for leave. Stephenson pursued the matter further with the warden on duty, and the warden laughed in her face.

## VI.  Sixth Incident: Attack by Co-worker

Following these above incidents, on September 18, 2000 Stephenson filed a complaint

4

alleging gender discrimination with the Equal Employment Opportunity Commission and the Philadelphia Commission on Human Relations.  Stephenson claims that after filing that complaint her supervisors failed to administer proper discipline against a co-worker, Correctional Officer Linda Burnette, after she threatened Stephenson during work.  After an inmate attacked her, Burnette criticized her co-workers for failing to come to her aid.  Angered, Burnette accosted Stephenson and other co-workers.  Stephenson claims she tried to calm Burnette, who responded with obscenity and violence, including throwing a set of keys in Stephenson's direction and bumping Stephenson with her chest.

Following the incident, Stephenson spoke with her supervisors, Lawton and Warden David Adams, about possible disciplinary measures against Burnette.  Stephenson claims that during this discussion Lawton pushed her, pointed his finger in her face, and announced that suspending Burnette would require suspending Stephenson because both parties were involved in the altercation.  According to Stephenson, Adams initially laughed at Lawton's actions and then advised Stephenson to file a report about Burnette's conduct.  Stephenson did so and received an invitation to attend the disciplinary hearing for Burnette.  Stephenson claims she refused to attend the hearing because hearing administrators refused to search Burnette before the hearing.  Stephenson feared for her safety because Burnette allegedly made threats against her before the hearing and Burnette allegedly had a history of violence.

Another employee, Sergeant Joseph Murray, also filed a report against Burnette arising out of the same incident.  Stephenson alleges that prison administrators never conducted a disciplinary hearing about Murray's report of Burnette's violence against him.  According to

Stephenson, she gathered from her years of experience working in the PPS that retribution for challenging prison officer hierarchy would come "sooner or later."

## VII.  Seventh Incident: Conjunctivitis

In 2001, Stephenson contracted conjunctivitis and, as a result, exhausted her sick leave, leaving her no choice but to come to work still infected.  At work, co-workers noticed Stephenson's condition and kept their distance.  However, Stephenson's supervisors, Lawton and Giorla, did get close enough to deny Stephenson's request to use personal time to leave work. Stephenson finally did leave work and the records indicated she left "sick."

## VIII.  Eighth Incident: The Betty Boop Pen

In 2001, Adams returned from a trip to Disney World with souvenir pens for his co-workers.  Stephenson alleges that Adams selected pens with Disney characters that reminded him of particular staff members.  When Adams distributed his gifts publicly to Stephenson, her co-workers got a big laugh seeing Stephenson receive her gift – a Betty Boop pen.  Stephenson alleges that this public presentation of a gift embarrassed and humiliated her.

## IX.  Ninth Incident: Emergency Card

According to Stephenson, in 2002 she sent a memo to Giorla asking him to remove her address from her emergency contact card, which supervisors stored in a central file accessible to all correctional officers.  Stephenson claims she feared that Burnette, who had access to the emergency card, would use the information to retaliate against her for reporting Burnette's violent behavior in 2001.  According to Stephenson, the emergency cards of all other sergeants provide only a phone number, not an address.  Giorla denied Stephenson's request and threatened

6

to write up Stephenson if she removed the card from the file.

X.  Tenth Incident: Separation from Employment

In December 2001, following an outdoor pursuit of an escapee, Stephenson became ill a few days before her scheduled vacation.  Stephenson claimed that she called in sick but the supervisor on duty, Lieutenant Donna Johnson, failed to record her call.  Stephenson claims that she notified Johnson of the error.  Johnson agreed to take responsibility for the erroneous record but warned Stephenson that Lawton intended to write her up for being absent without leave regardless of Johnson's error.  Distraught about this disciplinary action and distressed due to an overall perception of retaliation, Stephenson decided not to return to work following the advice of her physician.  She contacted appropriate PPS personnel to request time off under the Family Medical Leave Act.  Stephenson did receive a temporary grant of FMLA leave but failed to submit proper paperwork to secure final approval, even after PPS sent her a letter advising her of the need for documentation for final approval of FMLA leave.  Without proper leave granted, PPS concluded that Stephenson had abandoned her position and separated her from her employment.[1]  Stephenson claims that her psychiatrist failed to send to PPS paperwork supporting her request for FMLA leave.  Further, Stephenson claims that her depression and anxiety prevented her from contacting her psychiatrist or PPS to discuss the delay in production

---

[1] Defendants do not define or discuss the effects of an employment separation and they do not distinguish it from other employment actions such as unpaid leave or termination.  Presumably, under PPS policy, a separated employee can apply for reinstatement because defendants noted that Stephenson did not do this.  Presumably, separation means an employee does not receive compensation, benefits, or work assignments, but does not terminate the employment relationship.

of this documentation for FMLA leave.  Stephenson filed another complaint with EEOC and

PCHR on April 8, 2002 alleging retaliation for her initial complaint.

STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that

summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c) (2005).  The moving party "bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions . . . which it believes demonstrate

the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  After the moving party has filed a properly supported motion, the burden shifts to the

nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  Fed.

R. Civ. P. 56(e) (2005).

I must determine whether any genuine issue of material fact exists.  An issue is genuine if

the fact finder could reasonably return a verdict in favor of the non-moving party with respect to

that issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is material only

if the dispute over the facts "might affect the outcome of the suit under the governing law."  Id.

In making this determination, I must view the facts in the light most favorable to the non-moving

party, and the non-moving party is entitled to all reasonable inferences drawn from those facts.

Id.  However, the nonmoving party may not rest upon the mere allegations or denials of the

party's pleading.  See Celotex, 477 U.S. at 324.  The non-moving party must raise "more than a

8

mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  If the evidence for the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50 (citations omitted).

DISCUSSION

I.  Title VII

Defendants argue that Stephenson has failed to present actionable claims under Title VII for sex discrimination, retaliation, individual liability, and sexual harassment via a hostile work environment.  Defendants argue that the discrimination claim must fail because she cannot show that she suffered an adverse employment action or that she has suffered less favorable treatment than similarly situated employees of a non-protected class.  Defendants further argue that Stephenson cannot establish a retaliation claim because: (1) Stephenson's separation was not an adverse employment action; (2) even if it were, it lacks causal connection to her protected activity, i.e. filing an EEOC complaint; and (3) defendants had a legitimate non-retaliatory reason for separating Stephenson from employment.  Furthermore, defendants argue that Title VII claims against individual defendants must fail because Title VII only recognizes claims against employers, not individuals.  Finally, defendants argue that Stephenson did not suffer severe and pervasive treatment sufficient to constitute a hostile work environment and, even assuming a hostile workplace environment existed, the City has a viable affirmative defense against respondeat superior liability.

9

Stephenson fails to respond to defendants' arguments addressing gender-based discrimination and individual liability under Title VII.  See 42 U.S.C. § 2000e-2(a) (listing "unlawful employment practice[s] for an *employer*" (emphasis added)); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1078 (3d Cir. 1996) (en banc) (holding "that Congress did not intend to hold individual employees liable under Title VII"); see, e.g., Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 183-84 (3d Cir. 1997) citing Sheridan, 100 F.3d at 1077 (dismissing plaintiff's Title VII claims against individual supervisors).  Accordingly, I will grant summary judgment in favor of defendants with respect to those claims and will discuss only the parties' arguments concerning liability for the employer City of Philadelphia for retaliation and the hostile work environment.

A.  Retaliation

The City of Philadelphia first argues that Stephenson cannot establish a prima facie case for retaliation because her separation does not qualify as adverse employment action and she has failed to demonstrate a sufficient causal connection between the separation and Stephenson's protected activity.  Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [an employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a) (2006).  Under the familiar burden shifting framework for retaliation claims, Stephenson must first establish a prima facie case of retaliation, which once established "creates a presumption that the employer unlawfully discriminated against the employee."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 252-54 (1981);

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  Once a plaintiff has

established a prima facie case of retaliation, "the burden shifts to the [employer] 'to articulate

some legitimate, [non-retaliatory] reason for'" taking adverse employment action.  Burdine, 450

U.S. at 253, 254-55 quoting McDonnell Douglas, 411 U.S. at 802.  An articulation of a

legitimate non-retaliatory reason removes the presumption of retaliation and the burden then

shifts back to the plaintiff to show that the employer's stated reasons for its adverse employment

action "were a pretext for [retaliation]".  Burdine, 450 U.S. at 253, 256; McDonnell Douglas, 411

U.S. at 802.

## 1.  Prima Facie Case

"In order to succeed on a claim of discriminatory retaliation, a plaintiff must demonstrate

that: (1) [she] engaged in conduct protected by Title VII; (2) the employer took adverse action

against [her]; and (3) a causal link exists between [her] protected conduct and the employer's

adverse action."  Charlton v. Paramus Board of Education, 25 F.3d 194, 201 (3d Cir. 1994)

(internal citations and quotations omitted).  The City of Philadelphia does not dispute that

Stephenson engaged in protected activity under Title VII when she filed a complaint with the

EEOC and PHRC against her supervisors at PPS on September 18, 2000.

## a.  Adverse Employment Action

The City argues that Stephenson did not suffer any adverse employment action after she

filed the complaint.  To show adverse employment action, "plaintiff must show that a reasonable

employee would have found the challenged action [an employer's retaliatory conduct] materially

adverse, 'which in this context means it well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination.'"  Burlington N. and Santa Fe Ry. Co. v. White,

No. 05-259, 548 U.S. ___, slip op. at 13 (Jun. 22, 2006).  PPS contends that it merely "separated"

Stephenson from her employment because she abandoned her position when she failed to report

for duty as scheduled in January 2001, to request a leave of absence, and to submit proper

documentation to support her request for FMLA leave.  Three aspects of the separation support

the opposite conclusion: (1) the decision to separate came from the employer; (2) the action

concluded Stephenson's employment with PPS; (3) she no longer received scheduled work shifts,

benefits, or pay.  Because such consequences would ordinarily dissuade a reasonable employee

from making a discrimination charge, I find that the separation constitutes a materially adverse

action.

Stephenson also contends that PPS subjected her to a materially adverse action when it

exposed Stephenson to the risk of attack from Burnette by ignoring Stephenson's request that

PPS discipline Burnette and denying, without explanation, Stepheson's request to remove her

address from her emergency card.  However, the Supreme Court has held that "[a]n employee's

decision to report discriminatory behavior cannot immunize that employee from those petty

slights or minor annoyances that often take place at work and that all employees experience."

White, 548 U.S. ___, slip op. at 13.  Because Stephenson only makes allegations about the fear

and anxiety she felt from Burnette, but does not point to specific instances where Burnette

threatened her safety after their initial confrontation, she has not demonstrated treatment beyond

petty slights or minor annoyances.  Furthermore, because Stephenson has not presented objective

evidence of threats to her safety, her employer's conduct here would not dissuade a reasonable

person from reporting Title VII violations.  Concerning the discipline of Burnette and Stephenson's emergency card, there is no genuine issue of material fact as to whether a reasonable employee would find PPS's treatment of Stephenson a materially adverse action.

Stephenson also has characterized the separation as a constructive discharge.  Although a constructive discharge could constitute an adverse employment action, Stephenson has not sufficiently supported this claim.  To establish a claim of constructive discharge, Stephenson must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984).  Even accepting Stephenson's claim that she left PPS to safeguard her own mental health, she has not demonstrated how the threat to her safety posed by Burnette, the indifference her supervisors showed to her concerns, and Howard's erroneous report of her AWOL status created a sufficiently intolerable condition that would force a reasonable person to resign.  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084, 1084-85 (3d Cir. 1996) (finding a constructive discharge where an employee's "decision to leave was reasonable based upon the history of discriminatory treatment," which included continuous, public, racist harassment).  There is no genuine issue of material fact as to whether Stephenson was constructively discharged.  Thus, only Stephenson's separation from PPS constitutes conduct an employee would find materially adverse, and I will not consider further claims of retaliation regarding other PPS actions.

b.  Causal Connection

The City also argues that Stephenson cannot establish a causal connection between her

protected activity and her separation from PPS.  With the exception of very close temporal

proximity, "the mere fact that adverse employment action occurs after a complaint will ordinarily

be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two

events."  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997); see also Clark

County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal

proximity between an employer's knowledge of protected activity and an adverse employment

action as sufficient evidence of causality to establish a prima facie case uniformly hold that the

temporal proximity must be 'very close.'" (internal citation omitted)).  Nevertheless, an

employee can establish causal connection by presenting evidence of a pattern of the employer's

antagonistic behavior and inconsistent explanations of adverse employment action in the period

between protected activity and adverse employment action.  See Woodson v. Scott Paper Co.,

109 F.3d 913, 920-21 (3d Cir. 1997) ("[A] plaintiff can establish a link between his or her

protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism

in the intervening period."); Woods v. Bentsen, 889 F. Supp. 179, 188 (E.D. Pa. 1995)

("[A]dverse employment action, occurring a significant period of time following the exercise of

rights afforded under Title VII, does not create an inference of causation in the absence of other

evidence.").

         Here, the City argues that Stephenson's failure to report for assigned shifts, her failure to

produce FMLA documentation, and her failure to contact PPS about her leave all led to her

separation from employment.  While the mere fact that adverse employment action occurred after

protected activity does not create a causal connection, Stephenson has presented evidence of a

pattern of antagonistic behavior and inconsistent explanations.  With respect to antagonism, Stephenson presented evidence that PPS initially ignored Stephenson's concerns about Burnette, denied her protection at Burnette's disciplinary hearing, dismissed Murray's complaint about Burnette contrary to PPS practice concerning employee complaints, denied without stated reason her request to redact her emergency card, and ignored an error in her attendance record.  With respect to inconsistency, Stephenson has presented evidence suggesting that employees customarily receive a full disciplinary hearing regarding her AWOL status, whereas she claims that she did not receive similar process.  Although the separation order indicates that she "did not report for [her] hearing," I find that a genuine issue of material fact exists regarding the causal connection between Stephenson's protected activity and her separation from PPS.

Because the other alleged incidents – Stephenson's perceived indifference by PPS to her safety, the failure to discipline Burnette, the denial of permission to edit her emergency card, and the alleged constructive discharge – do not constitute adverse employment action, I need not discuss their causal connection to Stephenson's protected activity or consider them in any further analysis of her retaliation claim.

2.  Legitimate Non-Retaliatory Reason

After a plaintiff establishes a prima facie case, the burden shifts to the defendant employer "to rebut the presumption [of retaliation]. . . by producing evidence . . . [of] a legitimate, non-[retaliatory] reason" for the adverse employment action.  Burdine, 450 U.S. at 254; see also McDonnell Douglas, 411 U.S. at 802.  Defendant's burden is relatively light; an employer need only articulate a legitimate, non-retaliatory reason, but does not need to persuade

the court that such reason actually motivated the decision; consequently,.  <u>Burdine</u>, 450 U.S. at 254-55; <u>McDonnnell Douglas</u>, 411 U.S. at 802; <u>see also</u> <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994) ("The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.").  The City points to legitimate, non-retaliatory reason for separating Stephenson: Stephenson's two month absence from work combined with her failure to provide appropriate FMLA documentation or contact PPS regarding the matter.  Thus, I find that the City has articulated a legitimate, non-retaliatory reason for separating Stephenson.

3.  Pretext

The burden shifts back to plaintiff to persuade the court by a preponderance of the evidence that the employer is using the proffered reasons as a pretext for the actual discriminatory reasons that motivated the retaliatory action.  <u>Burdine</u>, 450 U.S. at 256; <u>McDonnell Douglas</u>, 411 U.S. at 802.  Stephenson appears to argue that PPS's reasons are a pretext for retaliation against her for her EEOC complaint because PPS did not follow proper procedure for separating her from employment and PPS has retained employees who had more significant records of being AWOL than Stephenson's.  To prove pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Fuentes</u>, 32 F.3d at 764.  Accordingly, Stephenson "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

16

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 764 quoting Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992). Furthermore, "factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638-39 (3d Cir. 1993).

Here, Stephenson alleges that PPS failed to provide her with a proper disciplinary hearing regarding her separation and argues that this procedural deficiency demonstrates that retaliation for filing the EEOC complaint, not PPS's stated reasons, motivated the separation. However, as Stephenson acknowledges, she never contacted PPS about the problems concerning her FMLA documentation, even after PPS sent her a letter about this problem. PPS's initial approval of her FMLA leave and its efforts to grant final approval of the leave suggest that PPS eventually resorted to separation solely because Stephenson failed to contact PPS or provide appropriate documentation. Because no presented evidence contradicts PPS's stated reasons for the separation, they are not pretextual for underlying retaliatory motives. Stephenson also points to PPS's retention of an employee, Lawton, who several decades ago had unexcused absences from work allegedly more egregious than Stephenson's. While Stephenson may find her employer's forgiveness of her supervisor's past disciplinary problems "ironic" or even suspicious, evidence of one distant occurrence is not sufficient to discredit the City's stated reasons for Stephenson's separation or to raise a genuine material issue of fact regarding pretext. Thus, I will grant defendant's motion for summary judgment on Stephenson's retaliation claim.

17

B.  Hostile Work Environment

The City argues that Stephenson has not presented evidence of harassment sufficiently "severe or pervasive [as] to alter the conditions of employment and create a hostile work environment."  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).  To support a hostile work environment claim based upon gender, Stephenson must show that: (1) she suffered intentional discrimination because of gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable woman in her position; and (5) respondeat superior liability existed.  See Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (noting that the second factor requires "severe or pervasive" harassment according to the Supreme Court in Pa. State Police v. Suders, 524 U.S. 129, 133 (2004)); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990) (listing the five factors for a hostile work environment claim).  While discrete acts of harassment may not constitute a hostile work environment, a pattern of discriminatory and facially neutral acts can collectively give rise to an actionable claim for a hostile work environment.  Nat'l R.R. Passenger Corp. v Morgan, 536 U.S. 101, 116 (2002); see also Andrews, 895 F.2d at 1486, n.3 ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit . . . .  A more fact intensive analysis will be necessary where the actions are not sexual by their very nature.").  "'[B]ecause discrimination is often masked in more subtle forms, it is often difficult to discern discriminatory animus'; therefore, 'with respect to certain conduct, the intent to discriminate can be inferred.'"  Benny v. Commonwealth of Pa., Dep't of Corrections, 400 F. Supp. 2d 831, 836 (W.D. Pa. 2005)

18

quoting Hartman v. Sterling, Inc., No. 01-CV-2630, 2003 WL 22358548, at *4 (E.D. Pa.

September 10, 2003) (internal quotations and citations omitted).

Whether severe or pervasive treatment exists depends upon a consideration of a totality of

circumstances, including: "(a) the frequency of the harassment, (b) its severity, (c) whether it is

physically threatening or humiliating or merely an offensive utterance, (d) whether it

unreasonably interferes with employee's work performance, and (e) its effect on an employee's

psychological well being."  Hawk v. Americold Logistics, LLC, No. 02-3528, 2003 WL 929221,

at *4 (E.D. Pa. Mar. 6, 2003) citing Harris v. Forklift Sys., 510 U.S. 17, 23 (1993); see also

Clegg v. Falcon Plastics, Inc., No. 05-1826, 2006 WL 887937, at *4 (3d Cir. Apr. 6, 2006) citing

Harris, 510 U.S. at 23 ("[W]hether the threshold level of severity and pervasiveness has been

reached . . . [depends upon the totality of circumstances including such] factors as the severity of

the harassment, the frequency of the harassment, and the degree of abuse."); Abramson v.

William Paterson Coll. of N. J., 260 F.3d 265, 280 (3d Cir. 2001) (applying Harris factors to the

fourth prong of the Andrews test).  However, the Supreme Court has instructed "that simple

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment."  Faragher v. City of Boca

Raton, 524 U.S. 775, 788 (1998) (internal quotations omitted).

1.  Gender-Based Discrimination

Here, Stephenson has not presented evidence of gender-based treatment.  "Title VII does

not prohibit all verbal or physical harassment in the workplace; it prohibits discrimination

because of sex."  Reyes v. McDonald Pontiac GMC Truck, Inc., 997 F. Supp. 614, 618 (D.N.J.

19

1998).  Stephenson's complaint about receiving a Betty Boop pen from Disney World does not

rise to an actionable level of gender-based harassment because it does not involve insulting

language degrading women, pornographic images in the workplace, or sexual objects placed in

her work space.  See Andrews, 895 F.2d at 1486 (determining that discrimination based upon

gender can include derogatory and insulting language targeting women, placing pornographic

images in work areas, and placing sexual objects on a plaintiff's desk).  Although Lawton

allegedly told her she could "go far if she played her cards right," no evidence supports her

desired inference that "playing cards" meant "be[ing] sexy and flirt[ing]."  Stephenson fails to

offer evidence beyond mere allegations that her gender motivated her employer's strict

enforcement of the uniform policy in the "600" building.  In the absence of circumstances

suggesting gender-based treatment, Stephenson cannot demonstrate that her employer

discriminated against her on the basis of gender in scrutinizing her leave requests and refusing to

allow her to use personal leave when she contracted conjunctivitis.

2.  Severe or Pervasive

Even accepting that an inference of gender-based conduct exists, Stephenson fails to

provide sufficient evidence beyond the allegations in her complaint to show severe and pervasive

treatment.  Stephenson presents nine specific occurrences over nineteen months in support of her

claim of a hostile work environment.[2]  However, these incidents collectively lack the frequency

to constitute a hostile work environment claim.  See Saidu-Kamara v. Parkway Corp., 155 F.

_____

[2] I will not credit Stephenson's  unsubstantiated allegations that discriminatory treatment
occurred "all the time."

20

Supp. 2d 436, 440 (E.D. Pa. 2001) (finding four incidents of unwelcome comments and touching "at best demonstrated sporadic and isolated incidents of harassment"); Calloway v. E.I. DuPont de Nemours and Co, No. 98-669-SLR, 2000 WL 1251909, at *6 (D. Del. Aug. 8, 2000) (calling over a dozen incidents of minor, but unwelcome, comments and gestures in a two month period "sporadic"); Cooper-Nicholas v. City of Chester, Pa., No. 95-6493, 1997 WL 799443, at *3 (E.D. Pa. Dec. 30, 1997) (finding eight alleged incidents of unwelcome comments over nineteen months neither "frequent or chronic").

Similarly, although the alleged comments about Stephenson "playing [her] cards right" or "looking pretty good" may breach customary workplace etiquette, but they do not rise to the level of severity sufficient to create a hostile work environment.  See Shramban v. Aetna, 262 F. Supp. 2d 531, 536 (E.D. Pa. 2003) (finding recurrent jokes and comments with alleged sexual and xenophobic overtones insufficiently severe to create a hostile work environment); Calloway, 2000 WL 1251909, at *5  (finding that "sporadic, unwelcome conduct and disparaging utterances" did not rise to the level of severe and pervasive treatment sufficient to make summary judgment inappropriate).

While Stephenson has presented one instance in which a co-worker, Linda Burnette, threatened her with violence, she cannot point to any further specific instances where Burnette posed a risk to her safety as a result of an employer decision.  Stephenson also presents no evidence concerning the extent to which the alleged hostile work environment impeded her ability to work.  See Gautney v. Amerigas Propane, Inc., 107 F. Supp. 2d 634, 644 (E.D. Pa. 2000) (finding no severe and pervasive treatment where plaintiff did not present evidence of

physical contact, physical intimidation, or conduct that interfered with work performance);
Cooper-Nicholas, 1997 WL 799443, at *3 (noting that the absence of physical threats weighs
against finding severe and pervasive conduct).

Despite having seen a psychiatrist, Stephenson also fails to present any evidence of the
psychological effects of the work environment and merely relies upon her allegations of physical
and psychological effects.  See Grazioli v. Genuine Parts Co. 409 F. Supp. 2d 569, 578-79
(D.N.J. 2005) (finding triable issue of fact where employee presented letter from a counselor as
evidence of psychological harm); Anderson v. DeLuxe Homes of PA, Inc., 131 F. Supp. 2d 637,
646-47 (M.D. Pa. 2001) (finding evidence of psychological effects upon plaintiff where
allegations supported by documentation from her physician).

Thus, Stephenson has not presented sufficient evidence to create a genuine issue of
material fact as to whether she endured severe and pervasive treatment sufficient to support a
hostile work environment claim.

3.  Subjective and Objective Effect

The City argues that Stephenson did not suffer detrimental effects from her treatment
while working at PPS and that a reasonable woman in her position would not suffer detrimental
effects.  Under the Andrews test, "[t]he third factor is a subjective inquiry of whether the
particular plaintiff was demonstrably injured[, and] . . . the fourth factor injects a requirement of
objectivity: it ensures that employers are held liable only when the work environment is hostile
from the standpoint of a reasonable person."  Suders v. Easton, 325 F.3d 432, 441-42 (3d Cir.
2003) citing Andrews, 895 F.2d at 1483.  To demonstrate subjective injury, Stephenson alleges

that she suffered adverse psychological and physical effects as a result of her employer: (1) denying her request to use personal leave; (2) commenting about her appearance in civilian clothes; (3) giving her a cartoon character pen of Betty Boop.  Because Stephenson has not presented evidence of her physical or psychological injuries arising from this treatment, she has failed to demonstrate sufficiently the subjective detrimental effects to constitute a hostile work environment claim.

To show the detrimental objective effects of this treatment, Stephenson relies upon her claim that the severity and pervasiveness of the harassment would create a hostile work environment for any reasonable, similarly situated employee.  As discussed above, Stephenson has failed to show severe and pervasive treatment.  Even if she had, she offers no evidence of how such a work environment adversely impacted other female sergeants in ASD.  Compare Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 600 (M.D. Pa.2002) (concluding that objective test not met where plaintiff failed to adduce evidence showing the frequency, severity, or impact upon plaintiff's work performance) with Mertig v. Milliken & Michaels of Delaware, Inc., 923 F. Supp. 636, 646-47 (D. Del. 1996) (finding that plaintiff met burden to defeat defendant's motion for summary judgment where plaintiff presented specific instances of subjective effects of harassment and corroborating testimony from other employees similarly situated to plaintiff); see also West v. Phila. Elec. Co., 45 F.3d 744, 757 (3d. Cir. 1995) (finding evidence of harssment of other employees on the basis of membership ion a protected class relevant to plaintiff's hostile work environment claim); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1275 (7th Cir. 1991) (finding evidence of discriminatory treatment of other employees, in

addition to plaintiff, "help[ed] to fulfill the objective standard of a hostile work environment"). Stephenson has not presented evidence of subjective and objective effects sufficient to give rise to a genuine issue of material fact.

Because Stephenson has not raised genuine issues of material fact regarding any of the first four elements of the Andrews test for a hostile work environment, I need not address respondeat superior liability and I will grant defendant's motion for summary judgment.

II.  Pennsylvania Human Relations Act (PHRA) and Philadelphia Fair Practices Ordinance (PFPO)

The City argues both that Stephenson failed to demonstrate either employer or individual liability under the PHRA and that Stephenson failed to demonstrate employer liability under the PFPO.  Because Stephenson has failed to respond to arguments concerning individual liability under the PHRA or employer liability under the PFPO, I will grant summary judgment on these issues.

The City also agues that because Stephenson cannot succeed in her Title VII claims, her claims under the PHRA must likewise fail.  I agree.  "The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably."  Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001); see also Cooper-Nicholas, 1997 WL 799443, at *4.  Because Stephenson has not presented evidence to show a genuine issue of material fact in her Title VII claim, she also cannot prevail in her PHRA claim.  Defendant's motion for summary judgment will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


LATANYA M. STEPHENSON          :          CIVIL ACTION
                               :
            v.                 :
                               :
CITY OF PHILADELPHIA, et al.   :          NO. 05-1550


<u>ORDER</u>

AND NOW, this 27th day of June 2006, upon consideration of defendants' motion for summary judgment, plaintiff's response, and for the reasons set forth in the accompanying memorandum, it is ORDERED that defendants' motion for summary judgment is GRANTED. Judgment is entered in favor of defendants, City of Philadelphia, Press Grooms, David Adams, William Lawton, Thomas Costello, and Louis Giorla, and against plaintiff, Latanya M. Stephenson.


                              s/Thomas N. O'Neill, Jr.
                              THOMAS N. O'NEILL, JR., J.